## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> STAR CHAIN, INC., and TIMUR EFE, a/k/a OMER CASURLUK, <br><br> Defendants. | Civil Action No. _____ <br><br> JURY TRIAL DEMANDED |

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff, U.S. Securities and Exchange Commission ("Commission"), files its Complaint and alleges that:

## SUMMARY

1. Beginning in approximately 2016, Defendant Timur Efe, a/k/a Omer Casurluk (hereinafter "Casurluk"), a dual citizen of the Republic of Turkey and the United States, and CEO and majority owner of Defendant Star Chain, Inc. (hereinafter "Star Chain") (collectively, the "Defendants"), operated an offering

fraud that targeted Turkish immigrants to the United States, many of whom were financially unsophisticated and spoke little English.

2.      The Defendants, through 23 affiliated limited liability companies they organized (the "US Star Companies"), raised approximately $9 million from approximately 30 investors to acquire numerous quick-serve-restaurant franchises ("QSRs") in the Southeastern United States.

3.      The Defendants made numerous misrepresentations to investors in connection with their investments.

4.      The Defendants frequently misrepresented their monetary interests in the US Star Companies, by claiming that both Star Chain and the investors would make substantial capital contributions to the companies.

5.      In reality, the Defendants often made little or no capital contributions to the US Star Companies, relying almost exclusively upon investors' contributions to fund the QSRs' acquisition costs.

6.       The Defendants frequently overstated the QSRs' acquisition costs to investors, and misrepresented investors' ownership stakes in the US Star Companies to the QSRs' franchisors.

7.      The Defendants altered and misrepresented the terms of the U.S. Star

Companies' operating agreements, and Casurluk induced investors, many of whom had limited English skills, to sign them.

8.      The Defendants failed to properly account for investors' investments in the US Star Companies, and Casurluk comingled and misappropriated investors' funds earmarked for QSR acquisitions.

9.      Star Chain, Casurluk and the US Star Companies eventually filed for bankruptcy protection, and all of the US Star Companies wound down and liquidated their assets.  Star Chain and nearly all of the US Star Companies were administratively dissolved in 2020.

10.     Investors lost a substantial amount of money as a result of the Defendants' misconduct.

## **VIOLATIONS**

11.     The Defendants engaged in, and, unless restrained and enjoined by this Court, will continue to engage in, acts, practices, schemes, and courses of business that constituted and will constitute violations of Sections 17(a)(1), (2) and (3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)(1), (2) and (3)], as well as Section 10(b) of the Securities Exchange Act of 1934

("Exchange Act") [15 U.S.C. § 78j(b)] and Rules 10b-5(a), (b) and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b) and (c)].

## JURISDICTION AND VENUE

12.     The Commission brings this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v] and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. § 78u(d), (e)] to enjoin the Defendants from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, and transactions, acts, practices, and courses of business of similar purport and object, and for civil penalties and other equitable relief.

13.     The Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v] and Sections 21(d), 21(e) and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa(a)].

14.     The Defendants, directly and indirectly, made use of the mails, the means and instruments of transportation or communication in interstate commerce, and the means and instrumentalities of interstate commerce in connection with the transactions, acts, practices, and courses of business alleged in this Complaint, and made use of the mails and means or instrumentality of

interstate commerce to effect transactions, or to induce or to attempt to induce the purchase or sale of securities alleged in this Complaint.

15.     Certain of the transactions, acts, practices, and courses of business constituting violations of the Securities Act  and Exchange Act occurred in the Northern District of Georgia.  Moreover, Casurluk resides in, and Star Chain's principal place of business was located in, the Northern District of Georgia.

16.     As such, venue is proper under Section 22 of the Securities Act [15 U.S.C. § 77v], Section 27 of the Exchange Act [15 U.S.C. § 78aa] and 28 U.S.C. § 1391.

17.     The Defendants, unless restrained and enjoined by this Court, will continue to engage in the transactions, acts, practices, and courses of business alleged in this Complaint, and in transactions, acts, practices and courses of business of similar purport and object.

## THE DEFENDANTS

18.     **Timur Efe, a/k/a Omer Casurluk**, age 41, resides in Alpharetta, Georgia.  Casurluk was the majority owner and CEO of Star Chain.

19.     **Star Chain, Inc.**, was organized in Georgia in 2016.  Its principal place of business was located in Roswell, Georgia.

## THE DEFENDANTS' OFFERING FRAUD SCHEME

### A.     Background

20.     Casurluk, a Turkish national, moved to the United States in 2009 and became the Executive Director of the Turkish American Chamber of Commerce ("TACC").

21.     In August 2016, Casurluk founded Star Chain and used it as a vehicle to own and operate QSRs, both as a sole owner and with investors.  Casurluk also established the US Star Companies, which were used as vehicles to seek investors and acquire QSRs (*i.e.*, Checker's Drive-In Restaurants, Captain D's Seafood Kitchen, Which Wich Superior Sandwiches, and Yogli Mogli Self-Serve Yogurt Bar).

### B.     The Investments in the US Star Companies

22.     Between 2016 and 2018, the Defendants established 23 limited liability US Star Companies.  Each US Star Company had a different numeric name based upon the order in which it was created (*e.g.*, US Star 1, LLC; US Star 3, LLC; US Star 4, LLC).  Some of the US Star Companies were purportedly joint ventures between Star Chain and third-party investors, whereas other unrelated (but similarly named) US Star Companies were wholly owned by Star Chain.

23.    Casurluk met investors through his work at the TACC and by word-of-mouth in the Turkish business community.  Many of the investors believed that Casurluk was assisting them with their investments as part of his duties at the TACC.

24.    The approximate $9 million that the Defendants raised from approximately 30 investors was used to acquire over 40 QSRs.

25.    The Defendants told investors that their investments in the US Star Companies would result in joint ventures between them and Star Chain.

26.    To participate, investors were required to provide funds equal to their purported ownership interest in a US Star Company (typically between 25% and 50%), multiplied by the purported acquisition costs for the QSR(s) acquired by the individual US Star Company.  The investor was then supposed to obtain an equivalent ownership interest in the US Star Company that was created for the acquisitions of the QSRs.

27.    Star Chain was supposed to provide the remainder of the acquisition costs for the QSR(s) and obtain an equivalent ownership interest in the acquiring US Star Company (typically between 50-75%).

28.     Casurluk instructed investors to wire their investment funds to a bank account in Star Chain's name, which he controlled.

29.     Investors were not involved in the daily operations of the QSRs. Rather, each QSR was to be operated by Star Chain (sometimes through a wholly-owned subsidiary).  In exchange for these services, Star Chain was to receive a 4% fee of each QSR's monthly revenue.

30.     The Defendants provided operating agreements for the US Star Companies to the investors who had an ownership interest in them.

31.     The operating agreements said that investors could receive regular reports concerning the operation of the US Star Companies in which they had an ownership interest and could inspect the companies' financial statements.

32.     The Defendants later altered some of the operating agreements, after they were signed by investors, to remove the investors' ability to inspect the financial statements.  Some of the investors who tried to obtain the financial statements were denied the ability to do so by the Defendants.

**C.     The Misrepresentations to Investors**

33.     The Defendants misled investors into believing that Star Chain would make substantial capital contributions towards the acquisition costs of QSRs owned

by the US Star Companies, and Defendants frequently misstated the costs to acquire the QSRs to investors.

34.     In fact, the Defendants often consummated QSR acquisitions using investor funds only, with no or minimal capital contributions by Star Chain.

35.     For example, in November 2017, Casurluk solicited and received an investment from one investor for Checkers Drive-In franchises owned by US Star 19, LLC.

36.     The operating agreement for US Star 19 reflected a $2.5 million acquisition cost for the franchises, an equal (50/50) ownership structure for the investor and Star Chain in the venture, and supposedly equal investments of $1.25 million from the investor and Star Chain towards the acquisition cost.

37.     In reality, US Star 19 acquired the Checkers franchises for approximately $1 million, using the investor's contribution to fully fund the acquisition.  Star Chain contributed no funds towards this acquisition.

38.     The Defendants also misrepresented the investors' ownership stakes in the respective US Star Companies.

39.     After an investor made a capital contribution, the ownership shares of the newly formed US Star Company were supposed to be divided between Star

Chain and the investor as a percentage of their capital contributions towards a particular acquisition.

40.     Although Star Chain made little or no capital contributions towards some of the acquisitions, the Defendants led investors to believe that it had done so and obtained ownership interests in the US Star Companies nonetheless.

41.     Furthermore, when the Defendants provided required ownership documents to the QSRs' franchisors, they often misrepresented that Star Chain and its executives were the sole owners of the US Star Companies.  The Defendants did not list the investors as partial owners or otherwise identify them to the QSRs' franchisors.

42.     The Defendants did so in order to prevent investors from communicating with the QSR franchisors and to conceal the nature and extent of their fraudulent conduct from investors.

43.     On at least one occasion in 2019, an investor contacted the franchisor of a QSR in which he had invested to inquire about the restaurant's operations.  The QSR franchisor informed him that it had no knowledge of him or his ownership stake in the QSR.

44.     On at least one occasion, Casurluk modified an operating agreement and forged an investor's signature, which enabled him to borrow money using the QSR as collateral without the investor's knowledge.

**D.     The Misuse and Misappropriation of Investor Funds**

45.     Casurluk regularly misused investors' capital contributions by comingling the US Star Companies' daily operating cash with Star Chain's funds and with the funds of unrelated businesses that he owned.

46.     The comingled monies were used to fund any of the entities as needed without a proper accounting, which resulted in the Defendants providing false financial reports to the US Star Companies' investors.

47.     Casurluk regularly transferred investors' funds to, and comingled them with, Star Chain and its subsidiaries, other US Star Companies, his personal accounts, and unrelated entities owned by him.

48.     Casurluk also misled Star Chain's CFO about the existence and number of investors, the use of their funds, and investment amounts.

49.     For example, on several occasions when large deposits appeared in Star Chain's bank accounts, Casurluk told the CFO that they were his capital contributions, when in fact, they were investors' capital contributions.

50.     By comingling investors' contributions and operating funds, and by failing to properly account for or advise investors about the comingling, the Defendants failed to disclose that they had improperly mixed the funds of separate businesses with separate owners.

51.     The Defendants also improperly accounted for funds earmarked for investments as operating capital.

52.     For example, one investor contributed $200,000 for the purchase of a 20% interest in a Checker's Drive-In franchise located near Augusta, Georgia. However, the Defendants did not disclose to the investor that the deal had fallen through.  Instead, the Defendants retained the investor's investment and used the money to fund other Star Chain operations, without the investor's knowledge or consent.

53.     Bank records reveal that Casurluk misappropriated more than $1 million in investors' funds for his personal use.

**E.     Star Chain's Demise and the Bankruptcy Proceedings**

54.     The Defendants' fraud and mismanagement were major factors in Star Chain's demise.  Star Chain was insolvent by August 2019.

55.     In October 2019, Star Chain, Casurluk and many of the US Star Companies jointly filed for bankruptcy protection, pursuant to Chapter 11 of the United States Bankruptcy Code.  Casurluk later removed his personal bankruptcy from the joint petition and converted it to a Chapter 7 proceeding.

56.     In connection with the bankruptcy petitions and proceedings, Casurluk threatened several investors that, if they hired attorneys and challenged the proceedings, they would receive no money.

## COUNT I – FRAUD

### Violations of Section 17(a)(1) of the Securities Act
### [15 U.S.C. § 77q(a)(1)]

57.     Paragraphs 1 through 56 are hereby re-alleged and incorporated herein by reference.

58.     From in or about 2016 to 2020, the Defendants, in the offer and sale of the securities described herein, by the use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly, employed devices, schemes and artifices to defraud purchasers of such securities, all as more particularly described above.

59.     The Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud.

60.     While engaging in the course of conduct described above, the Defendants acted with scienter, that is, with an intent to deceive, manipulate, or defraud, or with a severely reckless disregard for the truth.

61.     By reason of the foregoing, the Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT II – FRAUD

**Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act
[15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)]**

62.     Paragraphs 1 through 56 are hereby re-alleged and incorporated herein by reference.

63.     From in or about 2016 to 2020, the Defendants, in the offer and sale of the securities described herein, by the use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly:

> a. obtained money and property by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

-14-

b.  engaged in transactions, practices and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described above.

64.   By reason of the foregoing, the Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

## **COUNT III – FRAUD**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder [15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5(a), (b) and (c)]**

65.   Paragraphs 1 through 56 are hereby re-alleged and incorporated herein by reference.

66.   From in or about 2016 to 2020, the Defendants, in connection with the purchase or sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly:

a.  employed devices, schemes, and artifices to defraud;

b.  made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in

light of the circumstances under which they were made, not misleading; and

  c. engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described above.

67. The Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes, and artifices to defraud, made untrue statements of material facts and omitted to state material facts, and engaged in fraudulent acts, practices, and courses of business.  In engaging in such conduct, the Defendants acted with scienter; that is, with an intent to deceive, manipulate, or defraud or with a severely reckless disregard for the truth.

68. By reason of the foregoing, the Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

WHEREFORE, the Commission seeks the following relief:

## I.

Findings of fact and conclusions of law, pursuant to Rule 52 of the Federal Rules of Civil Procedure, finding that the Defendants committed the violations alleged herein.

## II.

Permanent injunctions enjoining the Defendants, their officers, directors, agents, servants, employees, and attorneys from violating, directly or indirectly, Sections 17(a)(1), (2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1), (2) and (3)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a), (b) and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b) and (c)].

## III.

An order requiring the disgorgement by the Defendants of all ill-gotten gains or unjust enrichment with prejudgment interest, to effect the remedial purposes of the federal securities laws.

**IV.**

An order pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] imposing civil penalties against the Defendants.

**V.**

Such other and further relief as this Court may deem just, equitable, and appropriate in connection with the enforcement of the federal securities laws and for the protection of investors.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands trial by jury in this action of all issues so triable.

Dated this 24th day of September 2021.

Respectfully submitted,

/s/ *M. Graham Loomis*
M. Graham Loomis
Regional Trial Counsel
Georgia Bar No. 457868
Tel: (404) 842-7622

Email: loomism@sec.gov


Robert F. Schroeder
Senior Trial Counsel
Georgia Bar No. 001390
Tel: (404) 942-0688
Email: schroederr@sec.gov

Justin Delfino
Senior Counsel
Georgia Bar No. 570206
Tel: (404) 942-0698
Email: delfinoj@sec.gov


COUNSEL FOR PLAINTIFF
U.S. Securities and Exchange Commission
Atlanta Regional Office
950 East Paces Ferry Road, N.E., Suite 900
Atlanta, GA  30326-1382