UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> STAR CHAIN, INC., and TIMUR EFE, a/k/a OMER CASURLUK, <br><br> Defendants. | CIVIL ACTION NO. 1:21-CV-03944-JPB |

## **ORDER**

This matter comes before the Court on the Securities and Exchange Commission's (the "SEC") Motion for Disgorgement, Prejudgment Interest and Civil Penalties Against Omer Casurluk [Doc 7]. This Court finds as follows:

## **FACTUAL BACKGROUND**

This case arises from a fraud operated by Casurluk and Star Chain, Inc., ("Defendants"), related to the acquisition of quick-serve restaurant ("QSR") franchises in the southeastern United States. [Doc. 1, p. 2]. Casurluk, a citizen of Turkey, moved to the United States in 2009 and became the Executive Director of the Turkish American Chamber of Commerce. Id. at 6. He founded Star Chain in August 2016, serving as its CEO and majority owner, and used it as a vehicle to own and operate QSR franchises. Id. at 1, 6. Between 2016 and 2018, Defendants

created twenty-three limited liability companies (the "US Star Companies"), which they used to seek investors and to acquire QSRs.  Id. at 6.  Defendants raised over $9 million[1] from approximately thirty investors and used those funds to acquire over forty QSRs.  Id. at 7.  This scheme targeted Turkish immigrants in the United States, many of whom spoke little English and were financially unsophisticated.  Id. at 1–2.

Defendants informed investors that their investments in the US Star Companies would result in joint ventures with Star Chain.  Id. at 7.  In the simplest terms, under this scheme, both investors and Star Chain would provide funds to a US Star Company.  Id.  Star Chain and the investors would then hold ownership shares in that particular US Star Company, divided as a percentage equivalent to their respective capital contributions.  Id.  The company would then be used to acquire one or more QSRs.  Id.  Investors were removed from the daily operations of the QSRs, which Star Chain would manage in exchange for a four percent fee of each QSR's monthly revenue.  Id. at 8.

Defendants ultimately misled investors in a number of ways.  For instance, Defendants represented to investors that Star Chain would make substantial capital

---

[1] Subsequent analysis by the SEC showed that Defendants raised approximately $15 million, not $9 million, from investors.  See [Doc. 7, p. 2 n.2].

contributions toward the acquisition of QSRs; instead, Defendants often commenced QSR acquisitions using only investor funds, with little to no capital contributions by Star Chain.  Id. at 8–9.  In the same vein, Defendants misrepresented investors' ownership stakes in the US Star Companies.  Id. at 9.  Defendants led investors to believe that Star Chain made significant capital contributions to the US Star Companies, and thus obtained an equivalent ownership stake, when Star Chain had not, in fact, done so.  Id.

Defendants also omitted investors' names from ownership documents of the US Star Companies when providing those documents to the QSR franchisors, instead representing that Star Chain and its executives were the sole owners of the US Star Companies.  Id. at 10.  The purpose of this practice was "to conceal the nature and extent of [Defendants'] fraudulent conduct from investors."  Id.  Similarly, the US Star Companies' operating agreements included terms that allowed investors to inspect the companies' financial statements.  Id. at 8.  Defendants, however, altered some of those agreements after they were signed by investors by removing the provisions allowing for the inspection of financial statements.  Id.  Investors who attempted to obtain and review financial statements were denied the opportunity to do so.  Id.

Defendants also misappropriated investor funds. Casurluk misused investors' capital contributions by comingling the US Star Companies' daily operating cash, Star Chain's funds and the funds of other, unrelated businesses owned by Casurluk. Id. at 11. These commingled funds were used without proper accounting. Id. Bank records show that, furthermore, Casurluk misappropriated over $1 million in investor funds for personal use. Id. at 12.

Star Chain was insolvent by August 2019. Id. Along with several of the US Star Companies, Defendants jointly filed for bankruptcy protection in October 2019 under Chapter 11 of the United States Bankruptcy Code. Id. at 13. Casurluk later removed his personal bankruptcy filing from the joint petition and converted it to a Chapter 7 proceeding. Id. Casurluk informed investors that if they challenged the bankruptcy proceedings, they would receive no money. Id. This suit followed.

## PROCEDURAL HISTORY

On September 24, 2021, the SEC filed an action in this Court, bringing three counts of fraud against Defendants: Count I, for violations of section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1); Count II, for violations of sections 17(a)(2) and 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(2), (a)(3); and Count III, for violations of section 10(b) of the Exchange Act and Rule 10(b)

thereunder, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(a)–(c).  Id. at 13–16.  The SEC sought permanent injunctive relief as well as an order requiring disgorgement of ill-gotten gains with pre-judgment interest and the imposition of civil penalties.  Id. at 17–18.

Contemporaneously with the Complaint, the SEC filed the consent of both Defendants to the entry of judgment.[2]  See [Doc. 1-1]; [Doc. 1-2].  The Court thus entered permanent injunctions as to Casurluk, [Doc. 4], and Star Chain, [Doc. 5], on February 1, 2022.  The Court ordered the SEC to file a subsequent motion as to the amount of disgorgement and any civil penalties owed by Defendants.  The SEC filed the instant Motion for Disgorgement, Prejudgment Interest and Civil Penalties on April 1, 2022, as to Casurluk only.[3]  [Doc. 7].

---

[2] In those filings and importantly for the matter before the Court, Defendants "agree[d] that the amounts of the disgorgement and civil penalty shall be determined by the Court upon motion of the [SEC], and that prejudgment interest shall be calculated based on the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax as set forth in 26 U.S.C. § 6621(a)(2)."  [Doc. 1-2, p. 2] (Casurluk's consent to entry of judgment); see also [Doc. 1-1, p. 2] (Star Chain's consent to the same).  Defendants also agreed that with regard to any motion for disgorgement and civil penalties, "the allegations of the Complaint shall be accepted as and deemed true by the Court" and "the Court may determine the issues raised in the motion on the basis of affidavits, declarations, excerpts of sworn deposition or investigative testimony, and documentary evidence, without regard to the standards for summary judgment contained in Rule 56(c) of the Federal Rules of Civil Procedure."  [Doc. 1-2, p. 2]; see also [Doc. 1-1, p. 2].

[3] The SEC explains that "Star Chain's liability is predicated solely on Casurluk's misconduct" and that "Star Chain did not derive any illicit profits distinct from [Casurluk]."  [Doc. 7, p. 2 n.1].  Moreover, because Star Chain is "insolvent, bankrupt

## ANALYSIS

**A.     Disgorgement**

    **1.     Legal Standard**

A district court may "require disgorgement . . . of any unjust enrichment by the person who received such unjust enrichment as a result" of a violation of the securities laws. 15 U.S.C. § 78u(d)(3)(A)(ii). In turn, "[t]he SEC is entitled to disgorgement upon producing a reasonable approximation of a defendant's ill-gotten gains." SEC v. Calvo, 378 F.3d 1211, 1217 (11th Cir. 2004). The SEC need not be exact; "[s]o long as the measure of disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty." Id. (alteration in original) (quoting SEC v. Warde, 151 F.3d 42, 50 (2d Cir. 1998)).

    **2.     Analysis**

The SEC seeks disgorgement of $6,471,874 from Casurluk. To support this figure, the SEC attached to its Motion a declaration from Neal Seiden, a certified public accountant and certified fraud examiner with the SEC's Division of

---

and defunct, and has no known operations or assets," the SEC does not seek from it any disgorgement or civil penalties. Id. Although the SEC seeks disgorgement, prejudgment interest and civil penalties only as to Casurluk, the Court refers to "Defendants" throughout this Order.

Enforcement. [Doc. 7-1, p. 2]. Seiden conducted a disgorgement analysis by reviewing the SEC's file on Defendants, documents from Star Chain's bankruptcy proceedings, agreements between investors and the US Star Companies, marketing materials used by Defendants to solicit investors and accounting information provided by former Star Chain employees, among other relevant documents. See id. at 3–4. Seiden's "disgorgement calculations are based on the gross proceeds raised by . . . Defendants from investors, reduced by the funds they returned to investors and the disbursements that may have been associated with legitimate business expenses." Id. at 6.

The SEC determined that the approximate amount of gross proceeds raised by Defendants was $14,874,248. Id. This sum represents the funds that the SEC initially determined were raised by Defendants from investors ($9,357,000), as well as funds from three investors that were omitted from the initial amount ($2,828,400) and additional funds raised from seven other investors ($2,688,848). Id. Defendants' business expenses totaled approximately $8,402,374, which represents the sum of $1,783,000 sent to investors and $6,619,374 used to acquire QSRs. Id. at 7. The difference between the amount that Defendants raised ($14,874,248) and their business expenses ($8,402,374) is $6,471,874. Id. This amount represents Defendants' net profits for the purposes of disgorgement. See

SEC v. Miller, 744 F. Supp. 2d 1325, 1342 (N.D. Ga. 2010) ("The primary purpose of disgorgement as a remedy for violation of the securities laws is to deprive violators of their ill-gotten gains."). After considering the methodology set forth in Seiden's declaration, the Court is persuaded that this sum "is a reasonable approximation of [Defendants'] ill-gotten gains." Calvo, 378 F.3d at 1217. The Court therefore orders disgorgement from Casurluk in the amount of $6,471,874.

**B.    Pre-Judgment Interest**

The SEC requests prejudgment interest totaling $576,385.75. Casurluk agreed that the prejudgment interest on any disgorgement award would be determined according to the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax, set forth in 26 U.S.C. § 6621(a)(2). See supra note 2. With that interest rate, the amount of prejudgment interest on Defendants' net profits from November 1, 2019, through March 31, 2022, is $576,385.75. The Court thus imposes prejudgment interest in the amount of $576,385.75.

**C.    Civil Penalties**

**1.    Legal Standard**

Section 20(d) of the Securities Act, see 15 U.S.C. § 77t(d)(1), and section 21(d)(3) of the Exchange Act, see id. § 78u(d)(3)(A), allow the SEC to seek and

8

the Court to impose civil penalties for violations of the securities laws.  These statutes "authorize three tiers of monetary penalties for statutory violations."  SEC v. Monterosso, 756 F.3d 1326, 1338 (11th Cir. 2014).  Under this scheme,

> [t]he first-tier penalty may be imposed for any violation; a second-tier penalty may be imposed if the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement"; and a third-tier penalty may be imposed when the second-tier requirements are met and the "violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons."

Id. (quoting 15 U.S.C. §§ 77t(d)(2), 78u(d)(3)(B)).  The amount of any civil penalty is within the discretion of the district court.  Id.

### 2. Analysis

The SEC seeks third-tier civil penalties because "Defendants' misconduct involved fraud *and* resulted in substantial losses to other persons."  [Doc. 7, p. 8]. The facts of this case clearly show that Defendants' conduct was fraudulent; the scheme involved misrepresentations to investors about the use of their funds and their ownership stakes in the US Star Companies and entailed serious misappropriation of investor contributions.  This fraud ultimately resulted in substantial losses to those investors.  The Court therefore agrees with the SEC that third-tier civil penalties are appropriate.  The civil penalty under § 77t(d) for a natural person whose conduct involved fraud and resulted in substantial losses is

$223,229.⁴  See Securities and Exchange Commission Adjustments to Civil Monetary Penalty Amounts, 88 Fed. Reg. 1614 (Jan. 11, 2023).

The SEC also asks this Court to double the penalty "because at least two violations were charged against . . . Defendants in the Complaint." [Doc. 7, p. 10]. "Because the relevant statutes authorize penalties for 'each violation,' courts are empowered to multiply the statutory penalty amount by the number of statutes the defendant violated, and many do." Miller, 744 F. Supp. 2d at 1345.  The Complaint in this case charged Defendants with violating Sections 17(a)(1), (a)(2) and (a)(3) of the Securities Act and section 10(b) of the Exchange Act.  See [Doc. 1].  Because Defendants violated two statutes,⁵ doubling the civil penalty is appropriate in this case.  Importantly, "[c]ivil penalties are intended to punish the

---

⁴ Civil monetary penalties must be "adjusted on an annual basis for inflation."  17 C.F.R. § 201.1001(b).  The maximum amounts of civil penalties under the Securities Act and the Exchange Act are thus adjusted annually, and notice of these adjusted amounts is published by the SEC in the Federal Register and on its website on or before January 15 each year.  Id.  "The adjusted penalty amounts will apply to all penalties imposed after the effective date of the adjustment . . . for violations that occurred after November 2, 2015."  Id.  The SEC attached to its Motion inflation adjustments to the civil monetary penalties as of January 15, 2022, and referenced that figure ($207,183) in its Motion.  See [Doc. 7-3].  Because the civil penalties in this case will be imposed after January 15, 2023—the effective date of the adjusted penalty amounts—the Court references the civil penalty amounts as of that date instead.  See 17 C.F.R. § 201.1001(b).

⁵ In the consent to judgment filed with the Complaint, Casurluk agreed that "in connection with the [SEC's] motion for disgorgement and/or civil penalties . . . [he] will be precluded from arguing that he did not violate the federal securities laws as alleged in the Complaint" and that "solely for the purposes of such motion, the allegations of the Complaint shall be accepted as and deemed true by the Court."  [Doc. 1-2, p. 2].

individual wrongdoer and to deter him and others from future securities violations." Monterosso, 756 F.3d at 1338.  Imposing a civil penalty and doubling that amount, based on the number of statutes violated, serves this punitive and deterrent function.  The Court therefore assesses a civil penalty of $446,458, which is double the penalty amount of $223,229, against Casurluk.

## CONCLUSION

For the foregoing reasons, the Motion for Disgorgement, Prejudgment Interest and Civil Penalties [Doc 7] is **GRANTED**.  The Clerk is **DIRECTED** to enter judgment against Casurluk in the amount of $7,494,717.75, which consists of $6,471,874 in disgorgement, $576,385.75 in prejudgment interest and $446,458 in civil penalties.

**SO ORDERED** this 3rd day of February, 2023.

J. P. BOULEE
United States District Judge